UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRAVELERS INDEMNITY CO.,     )
     )
    Plaintiff,     )
     )    Case No. 4:04CV01365 ERW
    vs.     )
     )
S.M. WILSON & CO. and BELL ELECTRICAL   )
CONTRACTORS, INC.     )
     )
    Defendants.     )

## MEMORANDUM AND ORDER

This matter is before the Court upon Plaintiff Travelers Indemnity Company's Motion for Partial Summary Judgment [doc. #37], Defendant S.M. Wilson's Motion for Summary Judgment Against Travelers Indemnity Company [doc. #39], and Defendant S.M. Wilson's Alternative Motion for Summary Judgment Directed to Bell Electrical Contractors, Inc. [doc. #44].

## I.    BACKGROUND FACTS

On May 5, 2001, Defendant S.M. Wilson and Company ("Defendant Wilson") entered into a contract with Ultimate Electronics, Inc. ("Ultimate") to provide general contractor services for the interior "finish out" of a new electronics store being opened in Fenton, Missouri ("the Contract"). Under the terms of the Contract, Defendant Wilson agreed that it would do all of the work necessary for the completion of the project.[1] On June 5, 2001, Defendant Wilson entered into a subcontract

---

[1]Under the Contract, "work" is defined as "the construction and services required by and reasonably inferrable from the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment, and services provided or to be provided by the Contractor's obligations." Pl's Ex. 5 at 2.

with Defendant Bell Electrical Contractors, Inc. ("Defendant Bell"), pursuant to which Defendant Bell would perform certain electrical work at the store ("the Subcontract"). Thereafter, in accordance with its obligations under the Subcontract, Defendant Bell installed a certain main electrical circuit breaker cabinet manufactured by Siemens Energy and Automation, Inc. ("the Cabinet") at the store.[2] The plans and specifications provided by Ultimate specified that the electrical cabinet to be installed should be one of four possibilities; the Siemens Cabinet was one of those four possibilities. Contained within the Cabinet was a certain lug assembly which connected the neutral conductor wire to the neutral bus bar. On June 30, 2002, shortly after Defendant Wilson had completed its work and the store opened to the public for business, a meltdown occurred in the Cabinet where the lug assembly and neutral conductor wire were connected to the neutral bus bar with screws ("the Incident"). This resulted in destruction of the Cabinet, as well as damage to other property, including pieces of consumer electronic equipment and components and other electrical equipment, systems, and wiring in the building. After the Incident, Dr. Lloyd Brown was retained to investigate. Dr. Brown investigated the Incident, prepared an expert report setting forth his opinions and conclusions, and testified in a deposition regarding these opinions and conclusions.

Prior to the Incident, Plaintiff Travelers Indemnity Company ("Plaintiff Travelers") had entered into a policy of insurance with Ultimate whereby it undertook to indemnify Ultimate in the event of a covered loss. In accordance with the policy agreement, Plaintiff Travelers paid Ultimate

---

[2]Plaintiff brought this lawsuit against S.M. Wilson & Company, the general contractor; Bell Electrical Contractors, Inc., the subcontractor; and Siemens Energy and Automation, Inc., the manufacturer. On March 7, 2005, all claims against Siemens were dismissed with prejudice by agreement of Plaintiff Travelers Indemnity Company and Defendant Siemens Energy and Automation, Inc. Thus, only the claims against Defendants Wilson and Bell remain. Defendant Bell has not moved for summary judgment with respect to any of the claims against it, and Plaintiff Travelers has not moved for summary judgment on its claims against Defendant Bell.

for that portion of Ultimate's loss which was covered by the insurance policy. In return, Ultimate subrogated Plaintiff Travelers to all of the rights, claims, and interest which Ultimate may have against anyone liable for the loss.[3] Plaintiff Travelers subsequently brought the instant suit as the subrogee of Ultimate.

## II.    SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the

_____

[3]Ultimate assigned to Plaintiff Travelers all of Ultimate's right, title, and interest in Ultimate's insured and uninsured losses.

3

nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III. DISCUSSION

The Complaint alleges that Defendant Wilson is liable for Ultimate's loss based on three theories of liability: (1) product liability, in that Defendant Wilson designed, manufactured, sold, distributed, assembled, or installed the Cabinet with a loose neutral wiring connection, rendering it defective and making it unreasonably dangerous; (2) negligence, in that Defendant Wilson breached its duty to Ultimate when it failed to properly secure the loose neutral wiring connection within the

Cabinet and when it failed to properly inspect the Cabinet, which would have disclosed the loose connection; and (3) breach of contract, in that Defendant Wilson breached the Contract by installing a defective product and refusing to comply with the Contract's indemnity provision. In the Motions currently before the Court, Plaintiff Travelers argues that it is entitled to summary judgment with respect to the breach of contract claim, and Defendant Wilson contends that it is entitled to summary judgment with respect to all three counts.

A.      Product Liability

Defendant Wilson argues that it is entitled to judgment as a matter of law on Plaintiff Traveler's product liability claim. According to Defendant Wilson, it cannot be held liable as a matter of law because it was merely the general contractor and not the manufacturer or seller of the Cabinet. Defendant Wilson argues that Missouri law precludes general contractor liability in circumstances such as those presented here. Plaintiff Travelers disagrees, contending that Defendant Wilson was a seller of the defective Cabinet because it supplied and installed the Cabinet through Defendant Bell, its subcontractor. According to Plaintiff Travelers, Missouri law does not shield general contractors from liability under the circumstances of this case.[4]

In 1969, the Missouri Supreme Court adopted the rule of strict liability in tort, as stated in

_____

[4]On June 29, 2005, Plaintiff Travelers filed Plaintiff's Response in Opposition to Defendant S.M. Wilson & Company's Motion for Summary Judgment. On July 8, 2005, Plaintiff Travelers filed Plaintiff's Surreply to Defendant S.M. Wilson & Company's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [doc. # 56]. According to Local Rule 7-4.01, any additional memoranda filed after the Reply memorandum "may be filed by either party only with leave of Court." L.R. 7-4.01(C). Plaintiff Travelers did not request leave of Court before filing its Surreply. Because Defendant Wilson does cite to new caselaw in its Reply, the Court will grant Plaintiff Travelers leave to file the Surreply and will consider the content of the Surreply, but only to the extent it responds to any new law or issues raised in Defendant Wilson's Reply.

Restatement (Second) of Torts § 402A:

> (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>     (a)    the seller is engaged in the business of selling such a product, and
>
>     (b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2)    The rule stated in Subsection (1) applies although
>
>     (a)    the seller has exercised all possible care in the preparation and sale of his product, and
>
>     (b)    the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Rest. 2d Torts § 402A; *see Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362, 364 (Mo. 1969) (adopting Restatement).  In adopting the rule of strict liability for tort, the Missouri Supreme Court pointed out that such a rule would help insure the costs of injuries arising from defective products will be borne by the manufacturers and sellers that put the products into the marketplace, rather than by the injured persons.  *Keener*, 445 S.W.2d at 364.  Under § 402A, the strict liability rule "applies to any person engaged in the business of selling products for use or consumption."  Rest. 2d Torts § 402A, cmt. f; *see also Keener*, 445 S.W.2d at 365 (quoting from Rest. 2d Torts § 402A, cmt. f.).  For example, the rule "applies to any manufacturer of [a product described in § 402A], to any wholesale retail dealer or distributor, and to the operator of a restaurant."  Rest. 2d Torts § 402A, cmt. f.  "The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods."  *Id.*

The issue before the Court is whether Defendant Wilson may be held liable as a "seller" within

the meaning of § 402A.[5] Defendant Wilson points to two Missouri cases that it contends support its proposition that Missouri courts have refused to hold general contractors strictly liable in product liability actions. Defendant Wilson points to *Volume Services, Inc. v. C.F. Murphy & Assoc., Inc.*, 656 S.W.2d 785 (Mo. Ct. App. 1983), and *Chubb Group of Ins. Co. v. C.F. Murphy & Assoc., Inc.*, 656 S.W.2d 766 (Mo. Ct. App. 1983), companion cases in which a Missouri appellate court addressed claims related to the collapse of the roof of the Kemper Arena in Kansas City, Missouri. In those cases, certain plaintiffs alleged that the defendants designed or manufactured the Arena, that it was in a defective condition unreasonably dangerous for any reasonably anticipated use, and that they had been damaged as a result of the defect. *Chubb*, 656 S.W.2d at 778. In recognizing that real property was subject to special treatment under other sections of the Restatement, the court stated that "the applicability of strict liability depends not on an arbitrary line of division between chattel and real property, but on a consideration of whether the policy behind such liability is applicable to the facts." *Chubb*, 656 S.W.2d at 779. The court determined that "[t]he underlying consumer protection principles of strict liability simply do not appear to be applicable to the constructors of a large commercial building built for a particular client presumably under contract with that client." *Chubb*, 656 S.W.2d at 780. The court found that plaintiffs had no cause of action for products liability against the architect and construction supervisor, the general contractor, or the consulting structural engineers. *Chubb*, 656 S.W.2d at 781. In contrast, the court did determine that a cause of action

---

[5]Neither Plaintiff Travelers nor Defendant Wilson cite to any Missouri case directly on point, and this Court has found none. Thus, in the absence of controlling authority, this Court undertakes to predict how the Missouri Supreme Court would rule if faced with the issue of whether Defendant Wilson is a seller within the meaning of § 402A. *See Pace Const. Co. v. Fidelity and Guar. Ins. Co.*, 934 F.2d 177, 179 (8th Cir. 1991) (in absence of controlling authority, district court should predict how Missouri Supreme Court would rule).

could lie against the provider of the steel bolts used to secure the roof's supports and the provider of the steel beams, which, if defective, may have been "products" within the meaning of § 402A. *Chubb*, 656 S.W.2d at 781. The court emphasized that these two entities could be held to the standards of strict liability "*as suppliers of products* incorporated into the structure." *Volume Servs.*, 656 S.W.2d at 793.

In a case with facts similar to the instant case, a California court determined a subcontractor could not be held strictly liable for supplying a certain defective product because it was not in the business of selling that product. In *Monte Vista Development Corporation v. Willey Tile Company*, 277 Cal. Rptr. 608 (Cal. Ct. App. 1991), the plaintiff alleged that, while cleaning a bathtub in her home, she braced herself by placing her hand on a ceramic soap dish mounted on the tile behind the bathtub, the soap dish broke, and she was injured as a result. 277 Cal. Rptr. at 609. The plaintiff sued the developer and the company which had installed her bathroom tile. *Id.* The developer cross-complained, naming the tile company and the building supply company, among others. *Id.* Pursuant to the terms of the bid for work on the homes under development, the tile company was to install soap dishes and other tile fixtures it purchased from the building supply company. *Id.* In determining that the tile company could not be held strictly liable for the defective soap dish, the court stated that the focus of its analysis was "not on whether [the tile company] was a subcontractor but whether the tile company came within the chain of commerce as a supplier of the soap dish to the extent that it became strictly liable if the item was defective." *Id.* at 611. The court concluded that the tile company was not a seller of the soap dish within the meaning of § 402A because it was not in the business of selling soap dishes or other fixtures, but only purchased such fixtures "in order to complete its subcontract with [the developer]." *Id.*

Here, Plaintiff Travelers's argument appears to be that Defendant Wilson should be held strictly liable because it is a seller in the distribution chain of the Cabinet. There is no dispute that Defendant Wilson's subcontractor, Defendant Bell, acquired the defective Cabinet from Siemens Energy and Automation, Inc. and installed it in accordance with its obligation pursuant to the Subcontract. However, neither Defendant Wilson nor its subcontractor, Defendant Bell, were sellers within the meaning of § 402A. Like the subcontractor in *Monte Vista*, Defendant Bell acquired and installed the defective Cabinet in order to complete the work required by the Subcontract. *See Monte Vista*, 277 Cal. Rptr. at 611. Like the tile company in *Monte Vista*, Defendant Bell was not a seller of the Cabinet within the meaning of § 402A, but only purchased the Cabinet in order to complete its obligations under the Subcontract. Indeed, the defective Cabinet was acquired and installed by Defendant Bell in accordance with the plans and specifications provided by Ultimate. *See Hinojasa v. Automatic Elevator Co.*, 416 N.E.2d 45, 48 (Ill. App. Ct. 1980) (policy reasons justifying strict liability are not applicable to product installers; one who simply installs a product "is not involved in the sale of the product and therefore receives no profit from placing the defective product in the stream of commerce" and "fact that an installer lacks the purchasing power of a retailer or a distributor makes it less able to exert pressure upon manufacturers to enhance product safety").

The Court concludes that, as a matter of law, Defendant Wilson cannot be held strictly liable for the damage caused by the defective Cabinet acquired and installed by Defendant Bell. Neither Defendant Wilson nor Defendant Bell was acting as a seller, manufacturer, wholesaler, or distributor of the defective Cabinet. Here, it appears clear that the Missouri Supreme Court would refuse to impose liability on Defendant Wilson. In fact, imposing strict liability on Defendant Wilson would not effectuate the Missouri Supreme Court's policy that strict liability should be used to insure that

the costs of injuries arising from defective products will be borne by manufacturers and sellers of those products. The underlying consumer protection principles of strict liability do not appear to apply to a general contractor whose subcontractor installed a defective product. *See Chubb*, 656 S.W.2d at 780 (consumer protection principles do not apply to constructors of commercial building built for particular client). Plaintiff Travelers cites no case in which a court has extended the principles of strict liability to facts such as those presented here, and the Court concludes that the Missouri Supreme Court would decline to so extend the cause of action. *See Hunt v. Guar. Elec. Co. of St. Louis*, 667 S.W.2d 9, 12 (Mo. Ct. App. 1984) (where evidence showed only that defendant installed an automatic timer pursuant to its contract to provide the services of electricians, policy reasons justifying imposition of strict tort liability not present because defendant merely rendering professional services); *Hinojasa*, 416 N.E.2d at 48 (declining to extend doctrine to situation where defendant merely installed a product supplied by another). Thus, because Defendant Wilson cannot be held strictly liable for the damage caused by the defective Cabinet, the claim made against it by Plaintiff Travelers necessarily fails. Therefore, Defendant Wilson is entitled to summary judgment with respect to Count I.

B.      Negligence

Count II of the Complaint alleges that Defendant Wilson breached its duty to Ultimate by failing to properly secure the loose neutral wiring connection within the Cabinet and by failing to properly inspect the Cabinet.[6] In moving for summary judgment on Count II, Defendant Wilson argues that it is entitled to judgment as a matter of law because there is no evidence that its actions fell below the applicable standard of care. According to Defendant Wilson, the investigation

_____

[6]The Complaint alleges that this inspection would have disclosed the loose connection.

performed by Dr. Lloyd Brown conclusively demonstrates that the cause of the fire was a latent defect in the Cabinet that could not have been discovered on site, thereby precluding a finding of negligence. Plaintiff Travelers contends that there are genuine disputes as to certain material facts and that summary judgment should be denied.

To prevail on a negligence claim under Missouri law, a plaintiff must establish the following elements: "(1) a legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the [plaintiff's] person or property." *Hoovers Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 431 (Mo. 1985). Ordinarily, negligence is a question for the jury, especially "when the evidence on the issue is conflicting or where, the facts being undisputed, different minds might reasonably draw different conclusions from them." *Rickman v. Sauerwein*, 470 S.W.2d 487, 489 (Mo. 1971). In moving for summary judgment, Defendant Wilson has the burden of establishing the non-existence of any genuine issue of fact that is material to judgment in its favor on the negligence claim. *See City of Mt. Pleasant,* 838 F.2d at 273. Then, the burden shifts to Plaintiff Travelers to set forth affirmative evidence and specific facts showing there is a genuine dispute on the negligence issue. *See Anderson*, 477 U.S. at 249. Plaintiff Travelers may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e). Plaintiff Travelers must show there is sufficient evidence favoring it which would enable a jury to return a verdict in its favor on the negligence claim, *see Anderson*, 477 U.S. at 249, and, if it fails to produce such evidence, summary judgment is proper. *See Olson*, 943 F.2d at 883.

In the Complaint, Plaintiff Travelers alleges that Defendant Wilson owed Ultimate "a duty to

do, or cause to be done, each of the matters complained of [in the Complaint] in a non-negligent manner, i.e., in a manner which was reasonable under the circumstances." Compl. ¶ 37. According to the Complaint, Defendant Wilson breached this duty when it failed to properly secure the loose neutral wiring connection within the Cabinet and when it failed to properly inspect the Cabinet. Compl. ¶¶ 38, 39.[7] Although Plaintiff Travelers argues that Defendant Wilson owed it some duty with respect to the Cabinet, Plaintiff Travelers does not identify the source or precise nature of this duty. First, Plaintiff Travelers appears to argue that Defendant Wilson can be held liable for the negligence of Defendant Bell, its subcontractor, on the basis of respondeat superior. However, there is no indication that Defendant Bell functioned as anything other than an independent contractor. Thus, respondeat superior principles do not appear to be applicable. *See Collins v. Feldman*, 991 S.W.2d 718, 720 (Mo. Ct. App. 1999) (application of respondeat superior depends on proof that master had right or power to control physical conduct of working party and, if no right to control, then no master-servant relationship exists). Thus, Defendant Wilson cannot be held liable for Defendant Bell's alleged failure to properly secure the loose connection within the Cabinet.[8]

Second, Plaintiff Travelers appears to argue that Defendant Wilson breached its duty by failing to properly inspect the Cabinet.[9] According to Plaintiff Travelers, a proper inspection would have revealed the loose connection. In response, Defendant Wilson argues that it could not have discovered the loose connection. Defendant Wilson points to the expert report of Dr. Lloyd Brown.

---

[7]These allegations are made against "Defendants, jointly or severally."

[8]There is no claim that Defendant Wilson itself performed the work necessary to install the Cabinet. Thus, Plaintiff Travelers is not arguing that Defendant Wilson should be held liable on the basis that Defendant Wilson itself failed to properly secure the loose connection.

[9]Plaintiff Travelers does not identify the source of this alleged duty to inspect.

In his report, Dr. Brown described the source of the problem he found at the Ultimate store in question:

> The problem occurred in the first (west most) panel on the north wall where the incoming 3-0 neutral conductor[10] attached to the neutral bus.[11] The neutral conductor was attached to a lug[12] that was bolted to the neutral bus. Two screws held the lug to the neutral bus and a single hex bolt held the neutral conductor in the lug hole.
>
> Examination of the remains shows that the conductor had been properly torqued tight in the lug. Further evidence shows that the lug had melted away at its surface where it attached to the neutral bus, which is positive evidence that the lug was not properly tightened down to the neutral bus.
>
> . . . . [A] neutral current in the order of 75 amperes was passing through the loose neutral connection and eventually melted loose the aluminum lug causing the neutral to come loose which in turn subjected part of the store outlets to be operating with an open neutral.
>
> . . .
>
> Some of the electric loads in this store were subjected to voltages that could have been as low as zero volts and as high as 208 volts. This is because the electric feeder circuit to the outlets had lost its neutral (open neutral).
>
> The neutral was lost because the input lug on the neutral to one of the panels feeding the store outlets had melted loose from the neutral bus. It burnt loose because it was not screwed down tight and a rather high neutral current was passing through this connection. This bus was installed at the factory and there is no way that a user electrician could have known that the problem existed.

Def. Wilson's Ex. C at 1-3. Defendant Wilson also points to various statements from Dr. Brown's deposition in support of its contention that it could not have known of the problem with the loose connection:

> Q:      . . . So your next opinion is that the screws that attached the connector

---

[10]A neutral conductor is a wire that conveys electricity with an equal potential difference between it and the other output conductors of a 3- or 4- wire system.

[11]A neutral bus is a terminal block with many small holes where the white neutral wire can be connected and tightened into place with a screw.

[12]A lug is a metal fitting to which electrical wires are soldered or connected.

assembly to the bus bar[13] was loose. . . .

. . . .

Q:    Okay.  Next opinion I heard was that that's a factory assembly?

A:    Absolutely, and it's a factory assembly that not only is a factory assembly, but it is an assembly that cannot be observed once the whole panel has been assembled at the factory.  In order to detect that after the fact, you would have to disassembly; you would have to pull the whole inside assembly out and recheck those screws, which are tightened from the back side underneath.

Q:    So is it your – do I gather then that you're also of the opinion that Bell – or that this was not observable by a field installer under normal circumstances that would be expected in a facility such as this?

A:    Yeah.  That's even further than an opinion.  That's an absolute fact.

. . . .

A:    Yeah, I mean by that it is a fact that you could not see it once it's assembled. No way could you see that without completely taking the panel apart.

Q:    No way positively absolutely?

A:    Absolutely.  That's – that is beyond an opinion, if I can use that term. . . .

Def. Wilson's Ex. D at 19-20.  Defendant Wilson has established, through the testimony of Dr. Brown, that it could not have discovered the defect upon inspection of the Cabinet.          Because Defendant Wilson has met its burden of establishing the non-existence of any dispute regarding whether it could have discovered the loose connection (i.e. whether its conduct fell below the applicable standard of care), the burden shifts to Plaintiff Travelers to set forth affirmative evidence and specific facts showing there is a genuine dispute on the negligence issue.  Most of Plaintiff Traveler's analysis on this point is directed to the issue of Defendant Bell's alleged negligence.[14]  In any event, none of the evidence to which Plaintiff Travelers points supports its contention that

---

[13]A bus bar is a conductor or an assembly of conductors for collecting electric currents and distributing them to outgoing feeders.

[14]Plaintiff Travelers argues that there is a disputed fact regarding whether the subcontractor could have discovered the defect when it bolted the neutral conductor cable to the same lug assembly identified as loose by Dr. Brown.  As already explained, though this argument may be material to Defendant Bell's alleged negligence, it is immaterial to the question of Defendant Wilson's negligence.

Defendant Wilson's conduct fell below the applicable standard of care. Plaintiff Travelers simply offers no evidence from which a reasonable finder of fact could infer that Defendant Wilson would have discovered the loose connection through inspection.[15] Plaintiff Travelers has failed to set forth

---

[15]Plaintiff Travelers points to three passages from Dr. Brown's deposition testimony, none of which support its contention that there is a factual dispute regarding whether the loose connection could have been discovered by Defendant Wilson. First, Plaintiff Travelers points to the following exchange:

Q:      Got you. But if it were a loose connection, it's – it could be felt under if it were loose enough?
A:      That would be true.
Q:      Okay. Now, if the connector on page – on Exhibit 1, page 3 that you show coming in to the left of the lug assembly, if it were loose enough, wouldn't it be – couldn't you feel it when you were assembling the connector in tightening down the lug?
A:      Well, in a sense, you just asked me that question, and I said if it's loose enough, but it's got to be loose as a goose for that to happen. The loose connection that we got here you're not going to feel them trying to move it.

Def. Wilson's Ex. D at 43. Second, Plaintiff Travelers points to deposition testimony in which Dr. Brown agrees with counsel that, if an installer "installed [the Cabinet] with the perception that it was loose, that would be beneath the standard of care of a reasonable installer of this type of equipment in this community at that point in time." Def. Wilson's Ex. D at 47. Neither of these exchanges indicate that a proper inspection would have revealed the loose connection or that Defendant Wilson failed in some way to properly inspect the Cabinet.
        Finally, Plaintiff Travelers states that "Dr. Brown also admitted that he does not have sufficient information, facts or data to opine that the lug assembly was not loose enough for the installer to feel it." Pl.'s Opp. [doc. #49] at 9. Though Plaintiff Travelers cites to a portion of Dr. Brown's deposition testimony in support of this statement, Plaintiff Travelers does not provide the cited portion as an exhibit. Thus, the Court is unable to examine the actual testimony that purportedly supports Plaintiff Travelers's contention that Dr. Brown admitted that he had no basis upon which to opine that the lug assembly was not loose enough to be discovered. Rule 56 requires that a litigant "set forth affirmative evidence and specific facts showing there is a genuine dispute on th[e] issue." *Anderson*, 477 U.S. at 249. To meet its burden under the summary judgment standard, Plaintiff Travelers must, "by affidavit and other evidence," set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). Plaintiff Travelers has failed to comply with this requirement, and the Court therefore need not consider Plaintiff Travelers's unsupported contention regarding Dr. Brown's "admission." In any event, this evidence, at most, pertains to the installer and does not create a disputed issue regarding Defendant Wilson's ability to have discovered the loose connection.

specific facts showing that a genuine issue of material fact exists as to whether Defendant Wilson's conduct fell below the applicable standard of care. Indeed, Plaintiff Travelers has failed to demonstrate there is any evidence favoring it which would enable a jury to return a verdict in its favor on the negligence claim as to Defendant Wilson. Therefore, summary judgment in favor of Defendant Wilson is warranted with respect to Count II.

        C.      <u>Breach of Contract</u>

The Complaint alleges that Defendant Wilson failed to perform under the Contract. Specifically, Plaintiff Travelers alleges that Defendant Wilson breached the warranty provision of the Contract, which states as follows:

> The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects, and that the Work will conform strictly to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by Owner abuse, modifications not executed by the Contractor, the Owner's improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

Def. Wilson's Ex. A, Gen. Cond. of the Contract for Const. § 3.5.1. Plaintiff Travelers argues that Defendant Wilson breached this warranty provision by using a Cabinet that was not of good quality and not free of defects. Defendant Wilson contends that no breach of the contract occurred because, as a matter of law, it cannot be held liable for damage caused by a latent defect in a product that was specified by the project owner.

In *United States v. Spearin*, 248 U.S. 132 (1918), the Supreme Court held that a contractor

is not liable for the consequences of defects in plans and specifications that are provided by the owner. *Spearin*, 248 U.S. at 136. The *Spearin* Court explained that, by prescribing the character, dimensions, and location of the work to be done, the owner "imported a warranty that, if the specifications were complied with, the [work] would be adequate." *Id.* at 137. In other words, a project owner extends an implied warranty to the contractor that, if the plans and specifications are followed, the contractor will not be responsible for the consequences of defects in the plans and specifications. Missouri courts have followed the *Spearin* principle. *See, e.g.*, *Sanders Co. Plumbing & Heating, Inc. v. City of Independence, Missouri*, 694 S.W.2d 841, 848 (Mo. Ct. App. 1985) ("Generally, when a contractor is to construct a project according to another's plans it does not insure that the plans are sufficient to obtain the result sought"); *Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer, Inc.*, 476 S.W.2d 153 (Mo. Ct. App. 1972) (where contractor is to build a specified structure according to another's plans and specifications, contractor does not insure that plans and specifications are sufficient to obtain result sought).

It appears that no Missouri case has addressed the more narrow issue currently before this Court as to whether a contractor may be held liable for damage that results from a manufacturing defect in a product specified by the owner.[16] It appears that only the Third Circuit has had the opportunity to address this issue in a case with facts substantially similar to the facts of the instant

---

[16]Neither Plaintiff Travelers nor Defendant Wilson cite to any Missouri case directly on point, and this Court has found none. Thus, in the absence of controlling authority, this Court undertakes to predict how the Missouri Supreme Court would rule if faced with the issue of whether a contractor may be held liable for damage that results from a manufacturing defect in a product specified by the owner. *See Pace Const. Co. v. Fidelity and Guar. Ins. Co.*, 934 F.2d 177, 179 (8th Cir. 1991) (in absence of controlling authority, district court should predict how Missouri Supreme Court would rule).

case.  In *Rhone Poulenc Rorer Pharmaceuticals, Inc. v. Newman Glass Works*, 112 F.3d 695 (3rd Cir. 1997), Rhone Poulenc Rorer, Inc. ("Rhone") contracted with Turner Construction Company ("Turner") to have Turner install glass in Rhone's headquarters.  In turn, Turner, as the general contractor, contracted with Newman Glass Works ("Newman") to supply and install the glass.  The subcontracts specified the type of glass to be installed and listed the three manufacturers from whom Newman could purchase the glass.  Newman began installing the specified glass, but, before installation was complete, the coating on the glass began to separate.  When Newman refused to replace the defective glass after Turner demanded that it do so, Turner sued Newman for breach of contract.  *Rhone*, 112 F.3d at 696.  Turner had expressly warranted to Rhone that all work would be free of faults and defects, and Newman had assumed this warranty toward Turner in the subcontract.  *Id.* at 697.  Relying on *Spearin*, Newman argued that, as a matter of law, it could not be held liable for any defects in the glass because it fully complied with the specifications given to it.  The *Rhone* majority began its analysis by noting that it was presented with "a conflict between the implied and the express warranties."  *Id.*  According to the majority, the express warranty contained in the subcontract (i.e. that all work would be "free from faults and defects") indicated that the parties had explicitly allocated to Newman the risk that the glass would be defective.  *Id.*  The majority concluded that, while it was true that Newman had "virtually no discretion in carrying out its contractual obligations in light of the exacting specifications in the subcontracts," it was also true that Newman "entered into subcontracts that require[d] it to remove and to replace any defective materials."  *Id.* at 698.  Thus, the majority found that the implied warranty based on the specifications of the type and manufacturer of the glass would yield to the express warranty against defective materials contained in the contract.  *Id.*

The *Rhone* dissent took a different view, however.[17]  The dissent began its analysis by noting

that Pennsylvania courts are reluctant "to hold subcontractors under specification contracts liable for

circumstances beyond their own control."  *Id.* at 700.  The dissent found that, under Pennsylvania

law, because "Newman complied with all of the specifications related to the type of glass installed

in the curtainwall," it "ought not to be liable for the defects in that glass that were beyond its control."

*Id.* at 701.  The dissent further noted that, "under the modern approach to *Spearin*, Newman should

not be liable for any defects in the materials as long as it complied with the specifications."  *Id.* at 702.

The dissent concluded:

> The subcontract did not require Newman to do more than it did with respect to the
> glass panels.  Therefore, Newman is not liable for the latent defect they contained.
> This defect caused the opacifier to separate from the glass after installation because
> the glue used to attach the opacifier to the glass became "tacky" under the
> temperatures in the curtainwall.  However, because that defect related to the
> particular glass used – which Turner specified – and not how it was installed, the
> defect was within the implied warranty of the specifications.

*Id.* at 702.

Although Missouri cases addressing this issue are sparse, it appears that Missouri courts

generally take the view that contractors should not be held liable for circumstances which are beyond

their control.  *See, e.g.*, *Sanders*, 694 S.W.2d at 848 ("Generally, when a contractor is to construct

a project according to another's plans it does not insure that the plans are sufficient to obtain the

result sought," and "[c]ommon sense dictates that the guaranty here is not a defense since, if it were,

a contractor would be penalized for doing exactly what it was required to do under another's plans."); 

*Eveready*, 476 S.W.2d 153 (where contractor is to build a specified structure according to another's

plans and specifications, contractor does not insure that plans and specifications are sufficient to

---

[17]The district court had also taken the view of the *Rhone* dissent.

obtain result sought and contractor should be paid if it did what it agreed to do). Thus, it appears that the Missouri Supreme Court would follow the view taken by the *Rhone* dissent that a manufacturing defect related to a particular item used, which was specified by the owner, lies within the implied warranty of the specifications. The Missouri Supreme Court would determine that the risk of damage from a manufacturing defect that could not have been discovered by the contractor rightly falls on the owner.

In the instant case, the owner, through its architect, specified that the electrical panel to be installed should be one of four possibilities, including the Cabinet manufactured by Siemens Energy and Automation, Inc. at issue here. By providing the specification regarding which electrical panel to use, Ultimate impliedly warranted to Defendant Wilson that the product and materials specified in the plans and specifications would be adequate. Defendant Wilson complied with the specifications provided by Ultimate and may not be held liable for a defect which was beyond its control. Thus, Defendant Wilson is entitled to judgment as a matter of law on Plaintiff Travelers's breach of contract claim.[18]

---

[18]Plaintiff Travelers also argues that Defendant Wilson breached the indemnification provision of the Contract, which states as follows:

> To the fullest extent permitted by law . . . the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), caused by the acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. . . .

Def. Wilson's Ex. A, Gen. Cond. of the Contract for Const. § 3.18.1. The Complaint alleges that

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Travelers Indemnity Company's Motion for Partial Summary Judgment [doc. #37] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant S.M. Wilson & Company's Motion for Summary Judgment Against Travelers Indemnity Company [doc. #39] is **GRANTED**. All claims against Defendant S.M. Wilson & Company are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Defendant S.M. Wilson & Company's Alternative Motion for Summary Judgment Directed to Bell Electrical Contractors, Inc. [doc. #44] is **DENIED as moot**.[19]

An appropriate Order of Judgment shall accompany this Order.

Dated this 14th day of September, 2005.

_E. Richard Webber_

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

---

Defendant Wilson failed to honor its obligations under this portion of the Contract. The Court has determined that Defendant Wilson was not negligent as a matter of law. Thus, Defendant Wilson was not obligated to indemnify Plaintiff Travelers on that basis. No determination has been made regarding the claims against Defendant Bell. Thus, a claim that Defendant Wilson has failed to comply with the terms of the indemnity provision is, at best, premature.

[19]Defendant Wilson brought this Alternative Motion, stating that, in the event the Court found in favor of Plaintiff Travelers on Count III (breach of contract), Defendant Wilson would be entitled to summary judgment on its cross claim against Defendant Bell. Because the Court did not find in favor of Plaintiff Travelers on Count III, Defendant Wilson's Alternative Motion is moot.